IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
EUFAULA HERITAGE          )
ASSOCIATION, et al.,      )
                          )
     Plaintiffs,          )
                          )        CIVIL ACTION NO.
     v.                   )         2:14cv1206-MHT
                          )             (WO)
ALABAMA DEPARTMENT OF     )
TRANSPORTATION, et al.,   )
                          )
     Defendants.          )
```

OPINION

Previously, the court denied a motion for a temporary-restraining order (TRO) to stop the widening of a road, from two to four lanes, in the historic district of the City of Eufaula, Alabama. City of Eufaula, Ala. v. Alabama Dep't of Transp., --- F. Supp. 3d ----, 2014 WL 7369783, at *1 (M.D. Ala. 2014) (Thompson, J.). This case is now before the court on two other motions: a motion for preliminary injunction and an alternative motion for an injunction pending appeal. As explained below, the preliminary injunction, which seeks the same relief as the TRO

motion did, will be denied as will the motion for injunction pending appeal.

## I.  BACKGROUND

The plaintiffs are three historic-preservation groups,[1] and the defendants are the Alabama Department of Transportation and its director, as well as the Federal Highway Administration and its division administrator.[2]  The plaintiffs assert that the defendants violated § 4(f) of the Department of Transportation Act (49 U.S.C. § 303),[3] § 106 of the National Historic Preservation Act (16 U.S.C. § 470f),

---

1. The historic preservation groups are the Eufaula Heritage Association, Alabama Trust for Historic Preservation, and the National Trust for Historic Preservation.  The City of Eufaula was originally a plaintiff as well, but is no longer a party to the case.

2. The director of the Alabama Department of Transportation is John R. Cooper.  The division administrator of the Federal Highway Administration is Mark Bartlett.

3. Essentially identical provisions are contained in § 18(a) of the Federal-Aid Highway Act, 23 U.S.C. § 138, and the plaintiffs also cite to this statute.

and the National Environmental Policy Act, also known
as "NEPA" (42 U.S.C. §§ 4321 et seq.).   The court has
federal-question jurisdiction pursuant to 28 U.S.C.
§ 1331.

This case arises out of the proposed widening of a
0.8-mile stretch of an Alabama road by the Alabama
Department of Transportation.   The street at issue
here--North Eufaula Avenue--is located in Eufaula,
Alabama.   It currently has two lanes and runs through a
historic district, with old houses lining each side and
a 30-50 foot median of billowing trees that overhang
the street.   The street is featured in the Alabama
Scenic Byway Program, which received some federal
funding, and is a major source of tourism income for
the city.   In addition, the State received a federal
grant for landscaping the street in the early 1990s and
for repaving in the last five years.

The street is also part of Highway 431, a
thoroughfare along the eastern side of Alabama that
runs to the beach in Florida.   Although the highway was
originally two lanes, other parts have been widened in

the past several decades.  The segments of the highway north and south of Eufaula were authorized for widening from two to four lanes from the 1960s to the mid-1990s, with construction taking place throughout this time period.  Both of those projects used federal money and complied with federal requirements.  Overall, the federal government has contributed $ 47 million on 57 different projects for repair and widening parts of the highway in the county in which Eufaula is located. Although federal-review documents for these projects noted that they were part of the State's long-term plan for a four-lane corridor through eastern Alabama, the federal government did not fund or approve of the North Eufaula widening in any previous review.

While much of this highway is now four lanes, North Eufaula Avenue remains two lanes, creating congestion and safety concerns, according to the State.  In 2005, the State tried to solve this problem by proposing a 6.8-mile bypass around Eufaula.  The bypass was estimated to cost somewhere between $ 40 million and $ 120 million and to take around three years for

construction.[4]   For this bypass, the Federal Highway
Administration completed a study on the environmental
impact of the bypass and approved a request from the
Alabama Department of Transportation to purchase real
estate for the bypass.   After the federal study,

_____

4.  In a 2014 presentation, the Alabama Department
of Transportation stated that the current estimated
cost for the bypass was $ 120 million. See "US 431
Eufaula, Alabama" Presentation (doc. no. 3-18) at 2.
However, the environmental assessment submitted to the
federal government when the bypass was being considered
estimated that the "proposed improvements" would cost
$ 41.8 million. See Environmental Assessment (doc. no.
36-2) at 4. The reason for this large discrepancy is
unclear, as inflation likely does not account for the
300 % increase in costs. As to construction time, the
State contends that the bypass "would not be available
for use for another 10-15 years." State Def. Opp. to
Prel. Inj. and Request for Inj. Pending Appeal (doc.
no. 45) at 7.  However, the environmental assessment
estimated that "project construction will last for
approximately 30-40 months." Environmental Assessment
(doc. no. 36-2) at 21.  Perhaps "project construction"
does not include the time it would take to acquire the
necessary land, but again the court is unsure how to
reconcile the three-year time frame in the
environmental assessment with the 10-15 year estimate
presented to the court now.

however, the Department withdrew the bypass project primarily based on cost concerns.[5]

Almost a decade later and earlier this year, the State decided to address the problem by widening North Eufaula. It decided to use only state funds on the project so that it could move "more quickly" and "more efficiently." The State began meetings on the issue with the community starting last spring and made a final decision sometime this fall. The project was released for bidding on December 5, 2014, and the State signed a contract for construction on December 10. The

---

5. In its earlier opinion, the court stated that "the bypass was never constructed due, in part, to local opposition." Eufaula, --- F. Supp. 3d at ----, 2014 WL 7369783, at *2. As the plaintiffs point out, that characterization was incorrect. Although the Transportation Department has noted that the bypass "was very unpopular due to traffic bypassing the business district" and noise concerns, "US 431 Eufaula, Alabama" Presentation (doc. no. 3-18) at 2, it has definitively stated that "[d]ue to funding limitations project work ceased." Id. Moreover, after the Transportation Department withdrew the project, the Eufaula City Council still supported it. See Eufaula City Council Resolution 13-2005 (doc. no. 40-1) at 1.

Transportation Department estimates that the project will cost slightly more than one million dollars.

Several days after the project was released for bidding, the plaintiffs brought this suit, requesting a TRO or, alternatively, a preliminary injunction to prevent the construction on North Eufaula Avenue. After briefing from both sides, the court denied the motion for a TRO.  <u>Eufaula</u>, --- F. Supp. 3d at --, 2014 WL 7369783, at *1.  The plaintiffs now renew their motion for a preliminary injunction or, in the alternative, request an injunction pending appeal. These motions are now before the court.


## II. DISCUSSION

The court will first address the motion for a preliminary injunction and then move to the motion for injunction pending appeal.


### A. Motion for Preliminary Injunction

In a motion for a preliminary injunction, the moving party must show "(1) a substantial likelihood of

success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." Grizzle v. Kemp, 634 F.3d 1314, 1320 (11th Cir. 2011) (internal quotation marks omitted).

The defendants allege that the plaintiffs do not meet any of the requirements for a preliminary injunction. For the same reasons articulated in the TRO opinion, the plaintiffs have failed to demonstrate a substantial likelihood of success on the merits, and the court therefore denies the motion for a preliminary injunction. Although the court stands on its earlier reasoning--and that opinion should be read in conjunction with this one--the court will address several additional issues. First, it briefly will address the Federal Highway Administration's argument that the court should have denied relief on jurisdictional grounds before reaching its three-factor

analysis.   Next, the court will turn to the following
issues raised by the plaintiffs: whether the court
should have applied segmentation analysis; whether the
court's pretext analysis was too narrow; whether the
court should have held that the bypass was a functional
equivalent of the current widening and therefore the
widening was a major federal action; and finally
whether the court underestimated the federal role in
the widening of North Eufaula Avenue.   The court will
take each argument in turn.


### i.  Jurisdiction

    Although it agrees with the court's conclusion on
the TRO, the Highway Administration argues that the
court erred in its legal approach by proceeding to its
three-factor analysis even though there was no
federal-agency action.

    The court does not understand the Administration's
argument.   The court agrees that it lacks jurisdiction
if there is no federal-agency action.   But the
three-factor analysis was the court's method for

determining whether federal-agency action existed--that is, whether the 0.8-mile stretch that used state funds was 'federalized' due to related federal work on the same highway.[6]  Put differently, the Administration invites the court to presuppose the answer before engaging in the analysis.  The court declines such an invitation.[7]

––––––––––––––––––––

6. All of the cases cited by the Highway Administration engage in this same analysis. See Rattlesnake Coal. v. U.S. E.P.A., 509 F.3d 1095, 1101 (9th Cir. 2007) (determining whether level of federal involvement in local project gave the federal decision-makers power or control over the project); Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 196 (D.C. Cir. 2003) (analyzing whether future federal funding "federalizes" a city's metro system built with solely state funds); Pres. Pittsburgh v. Conturo, 2011 WL 4025731, at *5 (W.D. Pa. 2011) (Cercone, J.) (holding that there was "not requisite involvement in the project by a federal agency" to require an impact statement).

7. To the extent that the defendants are arguing that the lack of federal planning or funding is dispositive, the court rejects this rigid test as well. Granted, the court does give weight to the fact that both the federal and state governments viewed this as a local, rather than federal, issue as well as to the Highway Administration's interpretation of its own regulations as applied to this case.

(continued...)

## ii. Segmentation Analysis

The plaintiffs argue that the court should have applied segmentation analysis in addition to the three-factor analysis.  The court disagrees.

As discussed in the TRO opinion, NEPA procedural protections apply to "major Federal actions significantly affecting the quality of the human environment...."  42 U.S.C. § 4332(c).  The question is how to define "major federal action."  In the earlier opinion, the court used three factors to evaluate whether there was enough federal involvement for the project to be a major federal action.  It concluded there was no federal action and that NEPA, therefore,

---

Nevertheless, courts must still be wary of situations where the federal government may turn a blind eye to federal projects or where States evade federal standards.  Other circumstantial evidence can uncover these scenarios.  For example, a State could tacitly admit a project is a major federal action by submitting an environmental impact statement, even if the federal government does not act on it.  Or, as discussed below, a State could build a functional-equivalent to an acknowledged federal project to avoid addressing environmental concerns.  While neither of these scenarios is the case here, the court refuses to endorse a bright-line rule that would allow States to evade federal regulations.

did not apply.  Eufaula, --- F. Supp. 3d. at ----, 2014 WL 7369783, at *6.  The plaintiffs argue that the court erred by failing to use segmentation analysis as an alternative test for whether a state project is actually a major federal action.  Although the segmentation test might be a helpful proxy in some cases for determining the level of federal involvement, the court affirms its position that segmentation is not a required test for determining whether there is a major federal action.

Federal regulations note that, "Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  As discussed in the earlier opinion, a major federal action can exist even where a State does not use federal funding.  Eufaula, --- F. Supp. 3d at ----, 2014 WL 7369783, at *2.  This brings up the question in dispute here: What can a district court look to in order to determine whether something is a major federal

action, when the presence of federal funding does not serve as an easy signal?

The animating concern underlying this question is that a State might use federal resources for a project and then avoid the accompanying federal rules by reclassifying a part of the project that might not pass muster under those rules. Correlatively, the court is also concerned that the federal government might improperly allow the State to do this.

Although there is no "litmus test" to address this concern, the court identified three circumstantial factors that help reach the underlying question: the presence of pretext, the degree of federal involvement, and whether the project was part of a larger, coherent project. Id. at *3-*5. After analyzing these factors, the court determined that the widening of North Eufaula Avenue was not a major federal action. Id.

The plaintiffs insist, however, that the court should not have stopped with that analysis and instead was required to apply an alternative 'segmentation

test' that the plaintiffs take from NEPA implementing regulations.  This segmentation test states:

> "In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each [environmental impact statement] or finding of no significant impact (FONSI) shall:
>
> (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;
>
> (2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and
>
> (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements."

23 C.F.R. § 771.111.  The Courts of Appeals are split on whether this test should be applied in this context. Compare Save Barton Creek Ass'n v. Fed. Highway Admin. (FHWA), 950 F.2d 1129, 1140 n.15 (5th Cir. 1992) (noting that, "absent a finding of major federal action, these [§ 771.111] criteria do not apply."); 

14

**Macht v. Skinner**, 916 F.2d 13, 16 n.4 (D.C. Cir. 1990) ("Because we hold that the Light Rail Project does not involve 'major federal action,' we do not decide whether the district court correctly held that Maryland's segmentation of the Project was proper. Unless a project involves major federal action, NEPA does not apply. The segmentation cases are distinguishable because they involve the question of whether a <u>federal</u> project has been illegally segmented to avoid compliance with NEPA."[8]), <u>abrogated on other grounds by</u> <u>Karst Envtl. Educ. & Prot., Inc. v. E.P.A.</u>, 475 F.3d 1291, 1297 (D.C. Cir. 2007), <u>with</u> <u>Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater</u>, 243 F.3d 270, 286 n.17 (6th Cir. 2001) (noting that the 'segmentation test' was an alternative test to determine whether something is a major federal action);

---

8. The plaintiffs contend that <u>Macht</u>, when read in context, does not preclude the use of the segmentation test to determine whether something is a federal project. The language, however, seems clear that the segmentation test is a different test that occurs only after a court has determined whether a project is a major federal action.

<u>Vill. of Los Ranchos de Albuquerque v. Barnhart</u>, 906 F.2d 1477, 1482 (10th Cir. 1990) (using segmentation test in addition to degree of federal involvement to determine whether project was a major federal action). The Eleventh Circuit has yet to rule on this issue.

This court agrees with the Fifth and D.C. Circuits that the segmentation test is required only if the court already has found a major federal action. The court reaches this conclusion for two main reasons. First, the plain language of § 771.111 suggests that segmentation is a test for federal agencies to ensure they conduct a "meaningful" and "full[]" evaluation after they have authority and control over a project rather than a test to establish their authority and control requiring an evaluation in the first place. In other words, without the requisite authority and control for a major federal action, there is no project for the federal government to segment, and, "[i]f there has been no segmentation, there, <u>a fortiori</u>, can have been no unlawful segmentation." <u>Brewery Dist. Soc'y v.</u>

**Fed. Highway Admin.**, 221 F. Supp. 2d 902, 914 (S.D. Ohio 2002) (Marbley, J.).

Second, the segmentation test does not reach the heart of the issue of whether there is enough federal involvement to establish the potential for federal control or responsibility over a project. <u>See</u> 40 C.F.R. § 1508.18 (specifically defining major federal action). None of the three factors in the segmentation test addresses whether there was federal planning, help, or money involved in a project. Although courts could use the 'segmentation test' as another circumstantial factor, the test does not--on its own--indicate levels of federal control as required by the definition of major federal action.

Third, the plaintiffs insist that the court <u>must</u> use the segmentation test, but they do not state <u>why</u> it must be used; they merely note that some other courts, outside the Eleventh Circuit, have employed it. The court is not convinced that § 771.111 was meant to lay out a mandatory test for the question of whether

something is a major federal action, and is not bound to use the test under precedent.

Moreover, even if the court were to apply the § 771.111 segmentation test, the test weighs against granting the plaintiffs relief.  The first factor is whether the project connects "logical termini." However, "where the highway segments in question, are not running between cities, but rather running through one city, logical termini are not so easily determined by a court." Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 440 (5th Cir. Unit B Feb. 1981).[9] Instead, as the plaintiffs suggest, "[t]he more important inquiry in such a situation is whether the projects have independent utility." Id.  As such, the court turns to independent utility.

_____

9. The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981, and all Former Fifth Circuit Unit B and non-unit decisions rendered after October 1, 1981. See Stein v. Reynolds Secur., Inc., 667 F.2d 33, 34 (11th Cir. 1982); Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

The plaintiffs argue that there is no independent utility because the widening of North Eufaula merely facilitates traffic along the Highway 431 corridor. However, "it is inherent in the very concept of a highway network that each segment will facilitate movement in many others; if such mutual benefits compelled aggregation, no project could be said to enjoy independent utility." <u>Coal. on Sensible Transp., Inc. v. Dole</u>, 826 F.2d 60, 69 (D.C. Cir. 1987). The correct inquiry is whether the "project serves a significant purpose even if the other related projects, the other segments, are not built for a long time or perhaps not at all." <u>Save Barton Creek</u>, 950 F.2d at 1141.

Here, the widening of North Eufaula Avenue serves an independent purpose. It alleviates safety problems for motorists and emergency-response vehicles. Furthermore, the Transportation Department is undertaking the North Eufaula widening project more than a decade after the major widening projects to its north and south. The fact that the Eufaula widening

was "not built for a long time" after the other projects suggests that the three projects, although related, served independent purposes at the time the State decided to construct them.  See Piedmont Heights, 637 F.2d at 441.

Last, the plaintiffs contend that the project would "restrict consideration of alternatives for other reasonably foreseeable transportation improvements" because it would make federal involvement in other related projects, such as the bypass, irrelevant.  23 C.F.R. § 771.111(f)(3).  The court disagrees.  As explained in detail below, the bypass and the widening of North Eufaula are vastly different projects in terms of their cost and timeframe for completion.  Committing one million dollars to the widening of North Eufaula does not foreclose the construction of a 65-mile-per-hour bypass in the future.[10]

---

10.  To the extent that the plaintiffs contend that the North Eufaula widening restricts consideration of alternatives by presenting a fait accompli to the Highway Administration, the court considered and rejected that argument in its previous opinion.  See (continued...)

In sum, the court holds that the segmentation test is not required by law and of little help in this case. Moreover, even if the test were required, the plaintiffs still would not meet their burden of proving a substantial likelihood of success on the merits.

### iii. Pretext

The plaintiffs next argue that the court's test for pretext is too narrow.  Specifically, the court defined pretext in its TRO opinion as when a State submits an impact study to the federal government, later withdraws the study out of concern it will fail federal standards, and then claims it will use only state money for a purely state project. See Eufaula, --- F. Supp. 3d at ----, 2014 WL 7369783, at *3.  The plaintiffs argue that requiring the submission of an impact study for pretext is "bizarre [because] ... it would allow state agencies to assert the exact same pretext that would otherwise be unlawful, if they have the foresight

_____

Eufaula, --- F. Supp. 3d at ----, 2014 WL 7369783, at *5-*6.

to assert the pretext sufficiently early in the process." Pl. Mem. in Support of Mot. for Prelim. Inj. and Request for Inj. Pending Appeal (doc. no. 40) at 5.

While the court understands the plaintiffs' argument, the plaintiffs miss the court's intention with the "pretext" factor. The court's point was that, when a State applies for a federal impact study and then later withdraws the application, the application approaches a tacit admission that the federal government has potential control or responsibility over the project, and the withdrawal of the application suggests that the State may be trying to avoid federal oversight. The court was not implying that this particular set of circumstances must be present for a finding of a major federal action or that a State that does not submit an impact statement can avoid scrutiny. As with discussions of pretext in other situations, the court lists pretext as a factor because it is an easy sign that something is amiss. However, just as the absence of a racial slur in a workplace does not end a question of racial discrimination, the lack of the

22

submission of an impact study does not end the question whether the State is truly engaged in a major federal action here. Indeed, the two other factors identified by the court also help to ferret out whether the State is taking federal resources without submitting to federal regulation.

Further, the court does not mean to suggest that the only way to prove pretext is to show the submission and withdrawal of an application for a federal impact study.   In a sense, all factors in the major-federal-action test examine whether the labelling of a project as a state, rather than federal, project was "pretextual."   With this in mind, a more appropriate label for this court's "pretext" factor might be something akin to "tacit admission."


### iv. Bypass as Functional Equivalent

The plaintiffs next argue that, because the bypass would have served the same function as the current widening proposal and was planned using federal money,

the widening, like the bypass, should be characterized as a federal project.

For this functional-equivalent theory, the plaintiffs rely primarily on <u>Brewery District Soc'y v. Fed. Highway Admin.</u>, 211 F. Supp. 2d 902 (S.D. Ohio 2002) (Marbley, J.). In that case, the city of Columbus, Ohio, proposed plans for an interchange project, which both parties agreed was a major federal project. <u>Id.</u> at 904. The problem, according to the plaintiffs, was that the city withdrew a connector that was part of this interchange and instead proposed to use its own funds to build an alternative connector with the same purpose--but in a different location--that ran through a historic district. <u>Id.</u> at 904-905.[11] Because it replaced a similar federal project, the plaintiffs in that case claimed that the alternative route should be subject to federal

_____

11. These facts were presented at the summary-judgment phase. The district court later found that the original connector was not part of the major federal action. <u>See Brewery Dist. Soc'y v. Fed. Highway Admin.</u>, 150 Fed. App'x 502, 504 (6th Cir. 2005) (affirming district court's finding).

24

procedural protections even though the city was not
using federal funds to construct this alternative.

Faced with this novel situation, the court held
that a road could be 'federalized' based on it being
the functional equivalent of a previous federal project
with the same primary purpose.  In reaching this
decision, the court first articulated two poles of this
situation:

> "Considering the hypothetical example
> of the City canceling [the original
> segment] and then seeking to use its
> own funds to construct, in the same
> time-frame as was contemplated for
> [the original segment], a road of
> quality and dimensions identical to
> [original segment], with the only
> difference between the two being that
> the 'new' road is at all points two
> feet to the east of the course set for
> [the original segment], it seems
> apparent that de minimis alterations
> to the 'old' federal plan cannot be
> enough to insulate an otherwise
> 'federalized' project from judicial
> review. At the same time, it is
> obvious that the City could terminate
> [the original segment] and then, ten
> years down the road, use its own funds
> to construct a road unrelated to [the
> original segment] in purpose or
> location."

<u>Id</u>. at 916.   For the more difficult cases falling in between these two poles, like the case before it, the court looked to the primary purpose, the levels of accessibility, the capacity, and the timing of the two roads.   <u>Id</u>.[12]

_____

12. The court elaborated:

"Where the 'federalized' road to be built is not functionally identical to the road contemplated in the federal project, but is designed to serve the same purpose as the road it is replacing, is compliance with 49 U.S.C. § 303(a) and 16 U.S.C. § 470 required? This Court finds, based upon the language and purpose of those two statutes, that the answer must be yes, with the following caveats:

1. fulfilling the role of the canceled federal project segment must be the primary purpose of the 'federalized' road (a question of fact); and

2. in order to succeed, the plaintiff must at least establish a <u>prima facie</u> case of 'functional replacement,' consisting of evidence tending to show:

a. the termini of the 'federalized' road are close enough to the termini of the canceled federal project segment to provide similar levels of accessibility;

(continued...)

26

As a threshold, this court finds the functional-equivalent test helpful in determining the degree of federal involvement. <u>See</u> <u>Eufaula</u>, --- F. Supp. 3d, at ----, 2014 WL 7369783, at *4. Although the Highway Administration criticizes the functional-equivalent test as novel, novel does not mean meritless. Indeed, the Administration would be hard pressed to maintain that a new project occurring "in the same time frame," having the same "quality and dimensions," and having the same purpose as an original

---

        b. the capacity of the 'federalized' road is approximately that of the canceled federal project segment;

        c. the construction of the 'federalized' road is not so remote in time from that contemplated for the canceled federal project segment that it could realistically have become necessary due to new traffic patterns; and

        d. the utility of the 'major federal project' of which the canceled project segment was a part is substantially enhanced by the construction of the 'federalized' road."

<u>Brewery Dist. Soc'y</u>, 211 F. Supp. 2d at 916-17.

federal project becomes de-federalized if moved "two feet to the east." Brewery Dist. Soc'y, 211 F. Supp. 2d at 916.[13] Such a position would invite States to flaunt federal environmental regulations with an easy loophole.

Applying the above analysis, the court finds the widening of North Eufaula is not the functional equivalent of the bypass. Granted, the projects are similar in that both would ensure that traffic moves more quickly and safely on Highway 431 through the current bottleneck. But, the similarities stop there.

---

13. The plaintiffs contend that the court focused too heavily on the location of the alternate route to the exclusion of other factors in its earlier opinion. See Eufaula, --- F. Supp. 3d, at ----, 2014 WL 7369783, at *4 (providing example where a State built a replacement road to a federal project 10 feet from the original site). This was not the court's intention. As explained above, multiple factors should play into this analysis, such as the function of the new project, the location, and the time between the old project and the new one. However, the court rejects the plaintiffs' argument that location (and by implication, time frame) should not be used because it would require the court to decide on a "magic distance" or magic time period. Courts often use standards rather than precise rules, especially considering questions that have no "litmus test" to reach a decision. See Save Barton Creek, 950 F.2d at 1134.

As the Alabama Transportation Department points out, the State designed the bypass to start at the outskirts of the city and allow motorists to drive at speeds of around 65 miles per hour around the city. The State envisioned it as a multi-year project that would cost at least in the tens of millions of dollars. In contrast, the widening of North Eufaula would enlarge a road through the downtown area of Eufaula, in which motorists will likely be constrained to much lower speed limits. The State estimates the widening will take several months at most and cost around one million dollars. These projects do not have the same time frame, quality, dimensions, or location. Moreover, most importantly, there has been a decade time span between the two projects. "[L]ater replacement construction, locally initiated and financed [cannot] be considered a federal project merely because it will relieve some of the same congestion that the [original road] would have." Brewery Dist. Soc'y, 150 Fed. App'x at 504 (affirming lower court) (internal quotation marks omitted).

29

v.   Federal Role on North Eufaula Avenue

The plaintiffs last argue that this court failed to recognize the extensive federal influence on the project.

First, they argue that the State used federal government funds to widen roads to the north and south of Eufaula, thereby creating the bottleneck in the current route.   The court addressed this argument in the previous opinion.   Although the roads around the 0.8-mile stretch were built using federal dollars, they were widened and approved over a series of decades. Additionally, as discussed in the earlier opinion, the fait accompli argument does not apply here. Eufaula, --- F. Supp. 3d at ----, 2014 WL 7369783, at *5-*6.

Second, they argue that the design of the road was a direct consequence of the State's having followed federal highway standards.   Both sides agree that the Transportation Department used the American Association of State Highway and Transportation Officials standards

as guidance to designing the widening.  The plaintiffs contend that, because the highway is part of the strategic highway corridor network, it had to apply these standards under federal law.  Even if this were true--which the State disputes--it cannot be that every project on Highway 431 (and a large number of highways running through the country) is federalized because it is part of the strategic highway corridor network.  <u>Cf</u>. Dec. of Mark D. Bartlett (doc. no. 36-4) at ¶¶ 7-16 (noting that the States "construct, own, operate, and maintain highways without federal involvement," including Highway 431).  Indeed, a number projects on Highway 431 previously have been completed using solely state funds.  Dec. of Ronald L. Baldwin (doc. no. 35-1) at ¶¶ 26-27.

Last, the plaintiffs note that the segment at issue received federal grants for landscaping and paving in the last several years, in addition to the scenic-byways grant.  These grants do not mean that the project to widen the road was a federal project.  A State can make improvements using only state funds to a

road originally built with federal dollars, and vice versa. Maintenance projects do not equate to federal control of larger actions.

### B. Motion for Injunction Pending Appeal

In the event the court denies a preliminary injunction, the plaintiffs request an injunction pending appeal under Federal Rule of Civil Procedure 62(c). The rule states in relevant part:

> "While __an appeal is pending__ from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."

Fed. R. Civ. Proc. 62(c) (emphasis added). The plain language of the rule requires that "an appeal is pending"; because the plaintiffs have not filed such an appeal, the court denies its request for an injunction pending appeal.

Even if an appeal were pending, the court would deny an injunction pending appeal. An injunction

pending an appeal is an "extraordinary remedy."
Touchston v. McDermott, 234 F.3d 1130, 1132 (11th Cir.
2000).  Four factors inform the decision: "(1) whether
the stay applicant has made a strong showing that he is
likely to succeed on the merits; (2) whether the
applicant will be irreparably injured absent a stay;
(3) whether issuance of the stay will substantially
injure the other parties interested in the proceeding;
and (4) where the public interest lies."  Nken v.
Holder, 556 U.S. 418, 434 (2009) (citing Hilton v.
Braunskill, 481 U.S. 770, 776 (1987)).[14]  "Since the
traditional stay factors contemplate individualized
judgments in each case, the formula cannot be reduced
to a set of rigid rules."  Hilton, 481 U.S. at 777.
Nevertheless, "the first two factors ... are the most

_____

14.  As the Supreme Court has noted, "[t]here is
substantial overlap between these and the factors
governing preliminary injunctions, not because the two
are one and the same, but because similar concerns
arise whenever a court order may allow or disallow
anticipated action before the legality of that action
has been conclusively determined."  Nken, 556 U.S. at
434 (internal citations omitted).  As discussed below,
the only discernable different for applying the factors
is that the stay is not as rigid a set of rules.

critical" and "it is not enough that the chance of success on the merits be better than negligible." Nken, 556 U.S. at 434; see also Veasey v. Perry, 135 S. Ct. 9, 10 (2014) (Ginsburg, J. dissenting) (dissenting because the court strayed from its traditional stay factors of likelihood of success on the merits and irreparable harm when rejecting a stay in an election-law case).

The court would deny the injunction pending appeal for the same reason it now denies the preliminary injunction--the plaintiffs have not shown a likelihood of success on the merits. Even with the plaintiffs' additional briefing, the court remains convinced that "this is a local concern" rather than a federal project and "should be resolved at the local level--that is, between the State of Alabama and the City of Eufaula." Eufaula, --- F. Supp. 3d at ----, 2014 WL 7369783, at *6.[15]

───────────────

15. As to the other "critical factor" of irreparable harm, the court, based on the current record, is not convinced that the plaintiffs have (continued...)

                               ***

    For the foregoing reasons, the court will deny the
plaintiffs' motions for a preliminary injunction and
injunction pending appeal. An appropriate order will be
entered.

    DONE, this the 29th day of January, 2015.

                         /s/ Myron H. Thompson
                    UNITED STATES DISTRICT JUDGE

_____

carried the day.  The plaintiffs' experts contend that
taking three feet off of both sides of the median will
lead to a decline of tree growth and the potential
death of many of the trees. See Dec. of George Barker
(doc. no. 3-35) at ¶¶ 19-26; Dec. of Arthur Chappelka
(doc. no. 3-36) at ¶¶ 11-15.  Although the defendants'
arborist agrees that some newer trees close to the curb
may die or need to be relocated, the arborist contends
that the remaining trees will fill in the open canopy
space and might actually become healthier from the
removal of some trees.  Arborist's Report (doc. no.
35-1) at 51.  The arborist also did not predict damage
to the interior trees from pruning the roots that
extent to areas of construction. Id. at 50.  For the
court, this expert dispute is in equipoise on the
current record; because the plaintiffs bear the burden
of proof, the court finds that the plaintiffs would
also not meet their burden on irreparable harm.